**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| HARSCO CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 3:07-0633 |
| v. | ) | Judge Trauger |
| | ) | |
| EUGENE PIONTEK and LEAVITT TUBE | ) | |
| COMPANY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM</u>

This is a trade secret case. The plaintiff alleges that the defendant corporation wished to

add a steel grating operation to its existing steel tubing operation and hired two former employees

of the plaintiff to help accomplish that. The plaintiff maintains that these two former employees

were under confidentiality obligations to it and that, in furnishing the assistance to the defendant

corporation that they did, they violated those confidentiality obligations and violated the

Tennessee Uniform Trade Secrets Act by misappropriating the plaintiff's trade secrets, among

other causes of action. The court held a three-and-one-half-day evidentiary hearing on the

plaintiff's Motion For Preliminary Injunction (Docket No. 31), which is now ripe for decision.

### <u>Factual Findings</u>[1]

The plaintiff, Harsco Corporation, through its IKG Industries division, manufactures steel

and aluminum bar grating for use primarily in industrial applications. (The plaintiff will be

---

[1]The court finds these to be the facts, having resolved conflicts in the evidence and having determined the credibility of the numerous witnesses who testified, often in stark contradiction to one another.

referred to throughout either as "Harsco" or "IKG.")  Harsco had been in the steel grating

business since the 1970's, most recently with operations in Texas, Indiana and Mexico.  The

Indiana serrated grating operation had been housed at Nashville until December 2005, when that

grating line was moved to Harsco's facility in Indiana.  Defendant Eugene Piontek had worked at

the IKG Nashville facility from 1980 to 1998, serving as the Vice President and General Manager

of IKG from 1986 to 1998.  Defendant Leavitt Tube Company, LLC, is a large steel tube

manufacturer that decided in the fall of 2005 that it wished to expand into the steel grating

business.

Steel grating can either be smooth or serrated.  Over the course of some twenty years,

Harsco had developed and modified a rotary serrator for the making of serrated grating that was

unique to Harsco.  All other steel grating manufacturers (of which there were three until Leavitt

entered the market) used punch presses of some sort to serrate their grating.  However, Harsco's

machine, with its uniquely designed cutter knives, could produce two lines of serrated steel from

a two-inch-wide strip of steel, in a continuously rolling process that was fast, uniform, efficient

and created no waste.  The evolution and perfection of IKG's rotary serrator took place over the

course of many years, mostly on the floor of its plants, using the hands-on expertise of its own

workers.  Harsco maintains that its entire serrator line, including all components, is a trade secret

that it has safeguarded over the years by imposing confidentiality obligations on officers,

employees, and people with whom it does business through several different means.

The first means used by Harsco to protect its proprietary information is its Code of

Conduct, which is revised from time to time, applies to all employees, and contains the following

provision:

Proprietary Information

Much of the information at Harsco is proprietary. That means that it is owned by Harsco. It is a valuable asset and must be protected. Unauthorized disclosure could not only eliminate its value to Harsco but also give unfair advantage to others.

Proprietary information includes copyrights and trade secrets as well as sensitive or private *technical*, financial and business *information*. It includes records, *practices*, letters, *plans*, *drawings*, and computer programs. It may concern new development projects, marketing plans, rate or cost data or customer negotiations. Any copyrightable works written by Harsco employees within the scope of their employment are the sole and exclusive property of Harsco.

Access to proprietary information is limited to those having a need to know. Any disclosure to others, as well as the receipt of proprietary information of others, must be in conformance with Company policies. There is a continuing fiduciary duty to Harsco for each employee to maintain the confidentiality of proprietary information *both during and after employment*. Harsco will take all appropriate actions to protect its proprietary information from improper disclosure

(Plaintiff's Ex. 31) (emphasis added) All new employees must view a video about the Code of Conduct, and a copy of the Code is posted near the time clock. Whenever the Code of Conduct is revised, employees are asked to sign an acknowledgement that they have received a copy of the revised Code of Conduct and have reviewed it.

Certain employees also are asked to sign a Supplemental Harsco Employee Agreement Relating to Inventions, Copyrights and Confidential Information, which contains the following provision:

2. During the term of employment under this Agreement, the Employee will have access to become familiar [sic] with various trade secrets including customer lists, pricing data, costs, accounts receivable data, *production processes* and output data. The term "trade secrets" means *devices*, secret inventions, *processes* and compilations of information, records and *specifications,* that are owned by the Employer and that are regularly used in the operation of the business of the Employer.

The Employee shall not disclose any trade secrets of the Employer, directly or indirectly, or use them in any way either during the term of employment with Employer, *or at any time after the term of employment*, except as required in the course of employment with Employer. All files, records, *documents*, *drawings*,

> *specifications*, *equipment and similar items* relating to the business of the
> Employer, whether or not prepared by the Employee, shall remain the exclusive
> property of the Employer and shall not be removed under any circumstances from
> the premises where the work of the Employer is being carried on, unless prior
> written consent of the Employer has been obtained.

(Plaintiff's Ex. 1) (emphasis added)

In addition to these restrictions on its employees, Harsco imposes a confidentiality

obligation upon those with whom it does business, including those who make parts and

components for its various manufacturing processes. The provision is contained in Harsco's

standard Purchase Order and reads as follows:

> 11. BUYER'S PROPERTY–All materials, dies, jigs, tools, *patterns*, *drawings*
> and *specifications* furnished by or paid for by Buyer in connection with this order
> shall be and remain the property of Buyer and shall be returned to Buyer upon
> request. While such property is in Seller's possession, Seller agrees to indemnify
> Buyer against all risks of loss and destruction thereof–normal wear and tear
> accepted. And all damages sustained by Buyer by reasons of such loss or
> destruction [sic]. Seller may not use Buyer's dies, jigs, tools, patterns, drawings
> or specifications for the design or production of goods for any other party.

(Plaintiff's Ex. 29) (emphasis added)

Much conflicting testimony was presented during the evidentiary hearing about how

much of its operations IKG allowed visitors to its plant to view. However, with the exception of

the two former Harsco employees accused of violating their duties of confidentiality, all other

present and former employees of Harsco testified that they considered Harsco's rotary serrator a

confidential trade secret that was not to be disclosed. Gate doors covered the workings of the

serrator itself, visitors had to sign in and be accompanied by Harsco employees on tours of the

plant, and individuals were not allowed to linger for long periods of time near the serrator line.

4

The most compelling evidence on this point was introduced by the plaintiff in rebuttal. Stan Suggs worked for IKG from 1976 to 2003, serving as superintendent and then plant manager in Nashville. He testified that defendant Piontek told employees to cover the serrator when visitors came to the plant and cautioned workers on several occasions not to let competitors view Harsco's equipment. Robert Dunk, the production manager at the Nashville IKG plant in the 1990's, testified that, after he had taken customers through the plant, showing them "what IKG did and how they did it," was reprimanded by Piontek. Piontek told him, "What we do and how we do it is confidential" and that the serrator was "a proprietary piece of equipment and people don't need to see it." He was told by Piontek not to conduct any more plant tours without his permission. This explicit testimony, which directly contradicted Piontek's own testimony, was not disputed by Piontek or anyone else tendered by the defendant in sur-rebuttal. In addition, the defendant introduced in its case in chief by deposition the testimony of Frank Harrison, a long-term IKG employee who worked on and refined the rotary serrator throughout his years at IKG. He testified that he had always considered the design of the rotary serrator confidential under Harsco's Code of Conduct.

Leavitt concedes that, although expert in the production of steel tubing, it had no employees with any expertise in steel grating, either smooth or serrated. Robert Pinkert, the managing director of Leavitt, whose nephew (also a managing director) had suggested that Leavitt get into the grating business, made contact with defendant Eugene Piontek through a mutual acquaintance. Piontek had been terminated by IKG in 1998 and was not employed when contacted by Pinkert in October of 2005. He was hired as a consultant with a two-year contract to "get the grating line up and running." He testified that he knew that his one-year noncompete

5

agreement had expired but either forgot or gave no thought to his continuing obligations under

Harsco's Code of Conduct, the Supplemental Employee Agreement he had signed in 1996

(Plaintiff's Ex. 1), or the covenant contained in his separation agreement which, in exchange for a

cash payment of $99,400 and other valuable benefits, obligated him to "not disclose to any

person or use for Employee's own benefit any confidential or proprietary information concerning

the customers, suppliers, price lists, catalogs, products, *operations*, sales techniques or other

business-related information of IKG or Harsco . . . ."  (Plaintiff's Ex. 2) (emphasis added)

      Piontek immediately contacted Robert Billings, who had worked under him at the

Nashville IKG plant for many years as maintenance supervisor.  Billings had been laid off by

IKG in 2003 and was looking for work.  Billings knew IKG's rotary serrator "inside and out,"

having supervised and participated in its being taken apart and put back together many times.

Piontek knew that Billings would be crucial in assisting him to get Leavitt into the grating

business.  In addition to being bound by Harsco's Code of Conduct and a Supplemental

Employee Agreement identical to Piontek's executed in 1995 (Plaintiff's Ex. 3), Billings had

executed a severance agreement that contained a provision very similar to that contained in

Piontek's separation agreement:

> As further conditions to the Company's performance of this Agreement, I agree:
> . . . (b) that I will not disclose to any person or use for my own benefit any
> confidential or proprietary information concerning the customers, suppliers, price
> lists, catalogs, products, *operations*, sales techniques or other business-related
> information of the Company . . . ."

(Plaintiff's Ex. 4 at 3) (emphasis added)

      Both Piontek and Billings signed on with Leavitt formally in January 2006.  Although

Leavitt never asked either of these former Harsco employees whether they had any continuing

6

confidentiality obligations to Harsco that might impact their work for Leavitt, Leavitt bound both

of them to broad confidentiality provisions that survived their relationship with Leavitt, just as

Harsco had done.  The Independent Contractor Agreement executed by each of them for Leavitt

contains this provision:

> <u>Non-Disclosure of Information</u>: PIONTEK [BILLINGS] agrees that he will not
> at any time, during or after providing services to LEAVITT, divulge or disclose
> any information concerning LEAVITT's business, including, but not limited to
> *trade secrets*, products or services, customers, *production methods*, *practices*,
> marketing, or other confidential information.  All books, records, forms, reports or
> other documents relating to LEAVITT's business, whether prepared by PIONTEK
> [BILLINGS] or anyone else, are the exclusive property of LEAVITT and shall be
> returned immediately to LEAVITT upon termination of this Agreement or upon
> LEAVITT's request at any time.

(Plaintiff's Exs. 6, 7) (emphasis added)  Leavitt's Chief Operating Officer, Parry Katsafanas,

conceded that, given the fact that IKG had the only rotary serrator at the time, he should have

asked Piontek and Billings if they were free to share information about the IKG serrator with

Leavitt.

On December 7, 2005, Piontek took George Peterson, Leavitt's Director of Operations, to

the Nashville IKG plant, which was in the process of closing down with its equipment being

shipped to Harsco's Indiana facility.  Although Billings told Piontek that he thought taking

Peterson to the Nashville plant was "walking the line a bit ethically," Piontek proceeded with his

plan, simply showing up with Peterson, unannounced.  They entered the plant through the

employee door and, although Piontek introduced Peterson to Ed Vaughn, the IKG employee in

charge of shipping IKG's equipment to Indiana, he did not tell Vaughn that Peterson was from

7

Leavitt or that Leavitt was thinking of going into the grating business.[2]  Although both Piontek and Peterson deny that they told Vaughn that Piontek was there to pick up something in shipping, as Vaughn asserted, they admit that they were allowed to walk around the plant for 30 to 40 minutes, during which time they viewed the bar grating line, the slitter line, and other processes of IKG.[3]  There was conflicting proof on this point, but the rotary serrator probably was not operating that day and probably was in the process of being disassembled for shipment to Indiana.  After the visit to the plant, Piontek and Peterson met Billings for lunch.  Billings was told that Leavitt needed a rotary serrator and was asked if he could do the drawings for one, to which Billings responded that he could.

Over the next several months, Billings spent many hours designing a rotary serrator for Leavitt that, in his own words, "was the same as the IKG machine."  He consulted with Piontek about aspects and specifications of the IKG rotary serrator operation and answered questions posed by Joe Gaske, Leavitt's industrial engineer who worked closely with Piontek and Billings.  Piontek and Billings helped Leavitt decide whether to duplicate IKG's rotary serrator or purchase a much more expensive and complex EVG serrator, made in Austria, that no one else in the

---

[2]Katsafanas testified that he knew that Piontek and Peterson were going to visit the Nashville plant and expected them to reveal why they were there.  He went on, "If they didn't, that was wrong."

[3]Harsco contends that either Piontek, during this visit, or Billings, during a later visit to the Nashville IKG plant (allegedly to get from his old office a Rolodex he had left behind), removed from that office drawings of the rotary serrator.  The court finds that some such drawings were in filing cabinets in Billings' old office during this period, but the circumstantial evidence of this theft is too weak to support the conclusion that it occurred as alleged.  Moreover, Billings did not need these drawings to make the drawings for Leavitt, given his intimate familiarity with the rotary serrator.

8

United States was yet using. Piontek and Billings recommended building a rotary serrator like IKG's.

In May of 2006, Billings arranged to take Gaske and Jimmy Helms, Leavitt's maintenance supervisor, to the Harsco plant in Garrett, Indiana because Leavitt seemed to have "absolutely no conception" of how a grating line functioned. Billings called John Pastorial, the manufacturing manager of the IKG Indiana plant, whom he knew and had worked with, and disingenuously told him that he (Billings) was consulting for a company that was interested in installing a Braner slitter machine and wanted to see one in operation.[4] Although Billings introduced Gaske and Helms to Mr. Pastorial, he did not reveal that they were from Leavitt and that Leavitt was going into competition with Harsco for grating business. Pastorial knew Billings and trusted him and so allowed them to watch the rotary serrator running for a few minutes and to view the conveyors and other parts of the operation. Pastorial testified, moreover, that he knew that, as an ex-employee, Billings had a continuing confidentiality obligation to Harsco under its Code of Conduct.

By April 2006, Billings had furnished to Gaske his drawings of the components of Harsco's rotary serrating line, including detailed specifications and other technical information. On May 5, 2006, Gaske sent off to Nova Machines & Engineering, a Canadian company, Billings' drawings and specifications. Although the owner of Nova, Vasanth Madhava, maintains, and Leavitt argues, that Nova basically discarded Billings' drawings as useless and came up with its own drawings for Leavitt's serrator line, Madhava makes important concessions in his testimony (which was introduced by deposition) that counter that assertion. Moreover, as

_____

[4]The Braner slitter is a commercially available component of IKG's grating line.

9

detailed hereafter, Harsco's expert testified that Billings' drawings most likely were essential to Nova's task.

Nova had never built a rotary serrator before (Madhava Deposition at 51), and the shape of the knife was new to him (*Id.* at 70). Initially, Madhava did not understand the serrating line (*Id.* at 150), and he asked Billings if the design did what it was supposed to do (*Id.* at 57). He concedes that Nova may have used Billings' drawings "to come up with our concepts" (*Id.* at 145) and may have used Billings' drawings "to build the serrating part" (*Id.* at 151). He stated that Nova had had no drawings for a serrator knife before receiving Billings' drawings and concedes that he does not know if the person who drew the serrator knife for Leavitt used Billings' drawings (*Id.* at 205-6),[5] nor whether the rotary knives were, in fact, changed from the drawings sent by Billings (*Id.* at 65).[6]

Not only did Billings, the IKG employee most intimately familiar with IKG's rotary serrator operation, testify that all parts of the rotary serrator built by Nova are functionally the same as IKG's, but Harsco called an expert witness who testified likewise. James K. Sprague, who holds a Ph.D. in mechanical engineering and applied mechanics from the University of Michigan in Ann Arbor, testified as an expert in the field of mechanical engineering, without

_____

[5]Madhava uses many engineers to do his design work, most of whom are Chinese with last names that Madhava does not know. The turnover rate of his Chinese engineers appears to be very high, and it seemed that all of the engineers who worked on this project were no longer with Nova.

[6]Mr. Kubik, whose company built for Harsco its second rotary serrator, using the first as the model, testified that the method by which the serrator's teeth mash together is "magic."

10

challenge to his qualification by the defendants.[7]  Using numerous photographs and drawings, in testimony that this court found extremely persuasive, Dr. Sprague testified to the following opinions, which he held within a reasonable degree of engineering and scientific certainty:

> (1) Information, including drawings and process diagrams prepared by Mr. Billings and provided to NOVA by Leavitt, contained sufficient detail specific to IKG's coil-to-coil rotary serrator, to allow NOVA to build a machine essentially identical in form and function to the IKG machine.
>
> (2) The rotary serrators at the Leavitt-Madison and the IKG-Garrett facilities are equivalent machines in terms of the type of product produced, the manner in which the product is made, and the rate of production.
>
> (3) It is unlikely that NOVA would have been able to develop the concept and actual machine, which is essentially identical to the IKG machine, without being supplied with drawings and technical guidance from Mr. Piontek and/or Mr. Billings.

(Docket No. 86 at 19)

Approximately ten days after receiving Billings' drawings, Nova sent a detailed quote to Leavitt, estimating the cost of building the rotary serrator.  After the passing back and forth of several proposals, Leavitt issued a purchase order for Nova to build the rotary serrator on June 26, 2006 (*Id*. at 241) for a price of $345,870[8] (*Id* at 242).  Nova delivered the rotary serrator to Leavitt in February of 2007, and Gaske testified that it was "up and running" by March of 2007.

In late 2006, Harsco learned that Leavitt was going into the grating business.  In early 2007, Harsco heard rumors that Piontek and Billings were consulting with Leavitt.  At that point, Harsco began investigating, but, among other challenges, finding documents was difficult

---

[7]The court found Dr. Sprague's testimony both reliable and relevant under Rule 702, FED. R. EVID.  His resume is included in Plaintiff's Ex. 40.

[8]Gaske testified that, in the end, the total cost was $381,000.

11

because the Nashville plant had closed in December of 2005, and documents from the plant were not easily accessible. By June 1, 2007, Harsco had accumulated enough information through its investigation to send a cease and desist letter to Robert Billings, which it did. (Plaintiff's Ex. 8) On June 12, 2007, Harsco filed this case against Billings in this court. (Docket No. 1) Billings was deposed and revealed what he, Piontek and Leavitt had done. On September 25, 2007, Harsco filed an Amended Complaint, dropping Billings as a defendant and adding Piontek and Leavitt as defendants. Harsco's Motion for Preliminary Injunction was filed October 27, 2007 (Docket No. 31) and, after a period of discovery, the evidentiary injunction hearing was held February 26 though 29, 2008.

Analysis

Preliminary Injunction Standard.

In deciding whether to issue a preliminary injunction, the court must consider the following factors: "(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004) (quoting *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994)). These are factors to be balanced, not prerequisites that must be met. *Id*. No single factor will be determinative as to the appropriateness of the equitable relief sought. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). The purpose of a preliminary injunction is simply to preserve the status quo; thus, findings of fact and conclusions of law made by a district court in granting a

12

preliminary injunction are not binding at a trial on the merits. *Univ. Of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Under Rule 52, Fed. R. Civ. P., a district court is required "to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue." *DeLorean Motor Co.*, 755 F.2d at 1228.

In its Second Amended Complaint, Harsco brings the following causes of action: (1) breach of contract against defendant Piontek; (2) misappropriation of trade secrets under the Tennessee Uniform Trade Secrets Act against defendants Piontek and Leavitt; (3) unlawful procurement of breach of contract against both defendants; (4) unfair competition against both defendants. (Docket No. 45) Harsco asks the court to issue a preliminary injunction with reference to all of these causes of action. In view of the necessity for an expedited decision as to the injunction, and because the court finds the proof sufficient under the misappropriation of trade secrets cause of action, the court will not analyze the proof as to whether an injunction would be justified on the other three causes of action.

<u>Misappropriation of Trade Secrets.</u>

In 2000, the Tennessee Legislature adopted the Uniform Trade Secrets Act. Tenn. Code Ann. § 47-25-1701 through 1709 ("the Act"). The Act defines a "trade secret" as:

> (4) "Trade secret" means information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
>
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

13

and "misappropriation" as:

>   (2) "Misappropriation" means:

>   (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

>   (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

>   (I) Used improper means to acquire knowledge of the trade secret; or

>   (ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:
>   (a) Derived from or through a person who had utilized improper means to acquire it;
>   (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>   (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

>   (iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Tenn. Code Ann. § 47-25-1702.

Harsco claims that the design and components of its rotary serrator production line is its trade secret subject to protection. All parties cite *Wright Medical Technology, Inc. v. Grisoni*, 135 S.W.3d 561 (Tenn. Ct. App. 2001) as instructive on the requirements for establishing a misappropriation of trade secrets claim in Tennessee. The factors outlined in that case for determining whether something is a trade secret are as follows:

>   (1) the extent to which the information is known outside of the business;

>   (2) the extent to which it is known by employees and others involved in the business;

14

(3) the extent of measures taken by the business to guard the secrecy of the information;

(4) the value of the information to the business and to its competitors;

(5) the amount of money or effort expended by the business in developing the information;

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Wright Medical*, 135 S.W.3d at 589.

These factors all militate in favor of the plaintiff's assertion that its rotary serrator operation is a trade secret. The IKG rotary serrator was developed over many years, in house, by IKG's own employees and was not known or utilized by any of the other three steel grating manufacturers before Leavitt entered the field. Even though certain components are commercially available (like the Braner slitter) or otherwise publicly known, the way in which all of the components are assembled and utilized in the serrating process makes the entire serrating operation protectible. *See Wright Medical Technology, Inc. v. Grisoni*, 135 S.W.3d 561, 591 (Tenn. Ct. App. 2001).

All of Harsco's employees are bound by the Code of Conduct to keep all aspects of its rotary serrator operation secret, and numerous higher-level employees execute additional agreements that contain confidentiality provisions covering it. Although visitors to Harsco's plants occasionally are allowed to view the rotary serrator for a few minutes, the heart of the machine is covered with gate doors that prevent a clear view of the operation of the serrating knives, and the proof was clear that these brief glimpses of the rotary serrator would not afford others enough opportunity to be able to duplicate the mechanism or process. Firms that make

15

parts for the rotary serrator or otherwise do business with Harsco in relation to the rotary serrator are bound by the confidentiality provision contained in Harsco's purchase orders.

As opined by Harsco's expert, Dr. Sprague, and other witnesses, Harsco's rotary serrator gave it a substantial advantage over other companies producing serrated grating, in that the product was uniform, produced at a much faster rate than was possible with other technologies, and the operation created no waste.[9] Harsco had many years and much effort invested in "the development and final configuration of" (Docket No. 86 at 19) its rotary serrator operation, which it did not voluntarily share with any competitor. Although Leavitt was familiar with a "slitting" operation, because of its steel tubing business, it had absolutely no familiarity with, or even conception of, what a serrated grating operation would entail or be composed of – thus the efforts of Piontek to take Leavitt employees to Harsco's operations to view the process. Harsco held no patents for any part of this operation and, therefore, that was not a means by which its technology would have been publicly available. The court finds that it would have been exceedingly difficult for Leavitt to "ascertain by proper means" (in the words of the statute) the information necessary to duplicate Harsco's rotary serrator.

Harsco must also establish that it made reasonable efforts under the circumstances to maintain the secrecy of its rotary serrator operation. *See* Tenn. Code Ann. § 47-25-1702(4)(B). Based upon the facts already discussed, the court finds that Harsco has sufficiently proved this element of its claim. However, given the vigorous defense by Leavitt that Harsco did not

---

[9]Specifically, Dr. Sprague gave this expert opinion on this point: "The IKG rotary serrator offers several substantial advantages over competing technologies, including speed, efficiency and durability. Much of this advantage can be attributed to the highly optimized design which IKG achieved through many years of trial and error development." (Docket No. 86 at 19)

sufficiently bind certain other companies to confidentiality with respect to the rotary serrator, some additional discussion is necessary.

Baytown Ace Machine Company in Texas had built the rotary serrator used by IKG at its Nashville facility until 2005, using Harsco's rotary serrator at its Channelview factory in Texas as the model. Leavitt maintains that Baytown did not view Harsco's rotary serrator as a trade secret and that Harsco did not sufficiently bind Baytown to keep its rotary serrator a secret in the process of this duplication effort. James Kubik, the owner of Baytown Ace, testified at the hearing by video deposition. He testified that this work was done in 1991 and that there would have been a purchase order issued by Harsco for the job.[10] Baytown worked very closely with Frank Harrison of IKG on this process, and certain changes were made in the design for this second serrator to improve its operation. The duplication took six months and cost close to $500,000. Kubik testified that Frank Harrison had told him that, "The rest of the world would love to know how this works." He further testified that, several years ago, IKG had "gotten wind" of the fact that someone was "fishing around" about their serrator operation. Harsco executives called Mr. Kubik in and asked him to confirm to Harsco that he understood that what they were doing in their serrating operation was a trade secret, which he did. Harsco executives told him that, "There are others in the industry that would love to know how we do stuff." Kubik testified that he considered not just the serrator but the way that the whole operation fit together was confidential and a trade secret.[11] Kubik further testified that, sometime in 2007, he was

---

[10]It is to be remembered that Harsco's purchase orders contain a confidentiality provision.

[11]Leavitt made much of the fact that Harsco's counsel and Oscar Jarrett, Harsco's vice president and general manager, had sought and secured from him, when Leavitt contacted Mr. Kubik about taking his deposition, a confirmation of his understanding of Harsco's trade secrets.

contacted by Joe Gaske of Leavitt, who told him that he had a rotary serrator machine in a

Mississippi plant that was not working properly and could Kubik help them. When asked why he

was calling Kubik, who primarily did business only for companies near his operation in Texas,

Gaske told him that he thought that Baytown were experts because they had built the IKG rotary

serrator. Kubik stated, "It was obvious they had taken someone's idea and it didn't work."[12]

Leavitt also took issue with whether or not Harsco had sufficiently bound a German

company, with which Harsco had dealings, to the confidentiality of its rotary serrator. The

plaintiff called the technical director of Lichtgitter, Achim Goetz, to testify about this issue.

Lichtgitter produces serrated steel grating that is not sold in the United States; therefore, Harsco

and Lichtgitter are not competitors in the United States market. In 2005, Lichtgitter was

considering building a serrator like IKG's, and Harsco had sent to Lichtgitter some drawings of

Harsco's serrator. Lichtgitter did not, in the end, build something akin to IKG's serrator because,

in the meantime, the European standard was established as a "half-moon" design, which IKG's

serrator did not produce. Goetz testified that there was a "crystal clear" mutual obligation of

confidentiality between the two companies, which had been working and still were working on

---

The court finds that, despite the fact that, at Kubik's request, Mr. Jarrett may have furnished
suggested wording to Mr. Kubik, who is a high school graduate and far from a sophisticated
businessman, this was not an attempt by Harsco to put words into the mouth of Mr. Kubik that he
otherwise would not have uttered. The court finds that his confirmation of his understanding
about Harsco's trade secrets was, in fact, just that–his understanding.

[12]Although Kubik did testify that Leavitt's serrator and the IKG's serrator "are as much
alike as a Volkswagen and a Cadillac are both cars," it is unclear how Mr. Kubik would have had
sufficient access to Leavitt's serrator to make this judgment. Moreover, this unsupported
testimony is in conflict with the well-researched and well-reasoned testimony of Harsco's expert
to the contrary. It must also be noted that Leavitt tendered no expert who compared the IKG and
Leavitt serrators or who opined on any of the issues before the court.

the possibility of a joint venture or technology exchange. Moreover, he testified that Lichtgitter could not have built the serrator from the drawings that Harsco had sent; Lichtgitter would have needed an experienced person to be able to use the designs to duplicate IKG's rotary serrator. He further testified that, although the Braner slitter used in IKG's serrator operation is not confidential in and of itself, the way that it is used by IKG in its operation is confidential. Oscar Jarrett substantiated this mutual understanding of confidentiality between Lichtgitter and Harsco.[13]

Leavitt also asserted that a company named Gogan in Cleveland, which allegedly constructed IKG's first serrator, and Tennessee Metal Works, which allegedly makes knives for IKG's rotary serrator, were never put under confidentiality obligations. However, the defendant produced no witnesses from these two companies, and Harsco witnesses testified that there would have been purchase orders issued by Harsco to these companies for the work that they did for Harsco that contained the necessary confidentiality provisions.

In sum, the court finds that Harsco has shown, by a preponderance of the evidence, that it made efforts reasonable under the circumstances to maintain the secrecy of its rotary serrator operation.[14]

_____

[13]Although the confidentiality understanding between Harsco and Lichtgitter was apparently entirely oral, that is sufficient under the Act. *See BDT Products, Inc. v. Lexmark Int'l, Inc.*, 124 Fed. Appx. 329, 332 (6th Cir. 2005).

[14]"While absolute secrecy is not required, there must be a substantial element of secrecy so that a third person would have difficulty in acquiring the necessary information . . . without resorting to the use of improper means of acquiring the secret." *Hickory Specialities v. B & L Laboratories*, 592 S.W.2d 583, 587 (Tenn. Ct. App. 1979). Harsco has met this standard.

Next, Harsco must establish misappropriation, and the court finds that it has so established as to both defendants. Although Piontek and Billings would have been entitled to use "the general knowledge, skill and experience . . . acquired over the course of [their] employment" with Harsco, they may not use "confidential business information." *Wright Medical*, 135 S.W.3d at 589-90. It is undisputed that neither Piontek nor Billings had any knowledge of or expertise in the steel serrating business before they began working for Harsco and that all of their knowledge in this area and all of their knowledge of Harsco's rotary serrator production process was achieved while working for Harsco. As consultants to Leavitt, they brought to Leavitt their detailed knowledge and expertise about the production of serrated grating and the construction and operation of IKG's rotary serrator, while they were both bound by various agreements and Harsco's Code of Conduct not to reveal this information to others. "[W]here the information is specific and confidential and would be useful primarily to a direct competitor of the former employer, it is likely not part of the former employee's general skill, knowledge and experience and is protectable." *Id.* at 590. Billings' drawings of the IKG rotary serrator revealed trade secrets, even though they contained "a mixture of secret information (e.g., dimensions, tolerances, and data-reference points) and non-secret information." *See Mike's Train House, Inc. v. Lionel, LLC,* 472 F.3d 398, 411 (6th Cir. 2006). Piontek assisted Billings in communicating to Leavitt confidential and proprietary information possessed by both him and Billings about IKG's rotary serrator. Although both Piontek and Billings seem to have conveniently forgotten all of their confidentiality obligations to Harsco, the fact remains that they had those obligations and owed a duty to Harsco to keep its rotary serrator operation secret.

20

Defendant Piontek violated the Act by disclosing Harsco's trade secrets without express or implied consent, knowing or having reason to know at the time of the disclosure to Leavitt that his knowledge of Harsco's trade secrets were acquired under circumstances giving rise to a duty to maintain secrecy. Tenn. Code Ann. § 47-25-1702(2)(B)(ii)(b). Leavitt violated the Act by acquiring the trade secrets of Harsco, knowing or having reason to know that the trade secrets were acquired by "improper means" (a breach of the duty to maintain secrecy by both Piontek and Billings). Tenn. Code Ann. § 47-25-1702(2)(A). Leavitt also violated the Act by using Harsco's trade secrets without consent, using "improper means" (inducing a breach of duty by Billings and Piontek) to acquire knowledge of the trade secret and, at the time of the use of the trade secret, Leavitt knew or had reason to know that its knowledge of the trade secrets was derived from persons who owed a duty to Harsco to maintain secrecy. Tenn. Code Ann. § 47-25-1702(2)(B)(I) and (ii)(c).

<u>Harsco's Delay in Seeking Injunctive Relief</u>.

The defendants have made a great deal of the fact that Harsco waited so long to seek an injunction. The defendants claim that Harsco "knew everything it needed to know" in order to seek an injunction by February of 2007. Harsco disputes that assertion and claims that it was simply methodically proceeding to investigate and substantiate its claims before prematurely requesting an injunction, the grounds for which they might not otherwise be able to establish. The parties have cited to support their positions cases with various periods of delay between the time that a plaintiff allegedly had grounds for an injunction and the time that an injunction was sought. Although an argument can be made that the plaintiff should have moved more quickly to seek to enjoin Leavitt's activities, the court cannot find, as Leavitt urges, that the plaintiff

21

purposely and unduly delayed and timed its injunction request for maximum impact upon Leavitt's entry into the serrated grating market. In making this determination, the court has had to make some judgment about the credibility and principles not only of Harsco's witnesses, but of its legal team. This the court has done and finds credible plaintiff's counsels' assertion that they did not want to request an injunction before having sufficient proof marshaled to secure it.

The chronology established by the proof reveals that Harsco knew in February of 2007 that Piontek and Billings were working in some way with Leavitt, which had announced it was going to enter the steel grating business. Harsco spent the next several months investigating exactly what the relationship was and attempting to discover the extent of the disclosure by its former employees to Leavitt. On June 12, 2007, Harsco sued Billings in this court, served him, and deposed him on July 19, 2007. At that point, Harsco became aware of Billings' version of the disclosures to Leavitt. On August 22, 2007, Harsco sent a cease and desist letter to Leavitt and, on August 27, 2007, Leavitt responded, denying any wrongdoing. Leavitt admitted that it had "retained the services" of Piontek and Billings but that it was "not aware of any contractual obligations owed by Messrs. Piontek and Billings to IKG." (Defense Ex. 18) On September 25, 2007, Harsco filed an Amended Complaint, dropping Billings as a defendant and adding Piontek and Leavitt as defendants. Leavitt was served on October 16, 2007, and counsel for the defendants entered a notice of appearance on October 25, 2007. The next day, October 26, 2007, Harsco filed its Motion for Preliminary Injunction. The injunction hearing was not held until February because expedited discovery was requested, and the scheduling of the hearing had to take into account the schedules of numerous lawyers and the court's availability for what was anticipated to be a three-day hearing.

The court cannot find in this course of events a delay so compelling that Harsco should be denied the relief to which it is clearly entitled.

Harsco's Right to a Preliminary Injunction.

As detailed above, Harsco has established by a preponderance of the evidence that it is likely to succeed on the merits of its claim against both defendants for misappropriation of trade secrets under the Act.  Harsco will suffer irreparable harm if the preliminary injunction is not granted because it will lose its unique place in the serrated grating market that allows it to produce a superior product at a faster pace than other technologies in use by its competitors.  In weighing the harm to Harsco and the harm to Leavitt, Leavitt's own witnesses clearly established that it would not be substantially harmed by the issuance of this injunction.  Leavitt intends to do whatever is necessary to stay in the business of manufacturing serrated steel grating.  It can easily acquire the technology used by other companies (punch presses) and set up a configuration that does not trod upon the proprietary nature of the rotary serrator process used by Harsco.  The public interest is advanced by the injunction, in that Piontek and Billings were bound to maintain the proprietary confidential trade secrets of Harsco by several different means.  They violated those obligations, and Leavitt knew or should have known that they were violating those duties to their former employer.  It is certainly in the public interest to enforce confidentiality agreements of this sort and to punish those who violate them and those who secure the violation of those agreements.

For the reasons cited herein, Harsco's Motion for Preliminary Injunction (Docket No. 31) will be granted by separate order.  Harsco's request for attorney's fees under Tennessee Code

Annotated § 47-25-1705(3) for willful and malicious misappropriation will be denied as premature and inappropriate at this stage of the litigation.

It is so **ORDERED.**

Enter this 5th day of March 2008.

_____
ALETA A. TRAUGER
U.S. District Judge

Case 3:07-cv-00633   Document 109   Filed 03/05/08   Page 24 of 24 PageID #: 1760